Minute Order Form (06/97)

JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Samuel Der-Yeghiayan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 8182 | **DATE** | 12/20/2004 |
| **CASE TITLE** | Mendez vs. City of Chgo | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Status hearing held. Plaintiff's motion to file two supplemental declarations and two surreply declarations is denied as moot. For the reasons stated in the Court's memorandum opinion attached to this minute order, defendant's motion for summary judgment is granted in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

courtroom deputy's initials: MW

Date/time received in central Clerk's Office

number of notices

DEC 22 2004 date docketed

docketing deputy initials

date mailed notice

mailing deputy initials

Document Number: 59

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| FERNANDO MENDEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 8182 |
| | ) | |
| | ) | |
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant's motion for summary judgment. For the reasons stated below, we grant the motion for summary judgment in its entirety.

## BACKGROUND

Plaintiff Fernando Mendez ("Mendez") began working for Defendant City of Chicago ("City") in May 1975 as a refuse collector. In 1993, he fell and injured his right knee. As a result of the injury, the City placed Mendez on "duty disability" from September 1993 until February 1997. During this time, Mendez suffered a respiratory illness and underwent a tracheotomy. Upon Mendez's return to work in

1

1997, the City assigned him to watchman duty at a storage garage located at 3200 S. Kedzie ("Kedzie garage").

Mendez worked at the garage for the next five years, during which the circumstances of his work changed several times. Initially, Mendez worked the night shift inside the garage building. In December of 2000, the City transferred Mendez to the day shift after his doctors had advised the City that this change was medically necessary. In July of 2001, the City allowed Mendez to spend his time in a heated and air conditioned trailer behind the garage while he was not making assigned tours. In December 2001, the City asked Mendez to select his preferred assignments from a list of nineteen, but Mendez chose to remain at the same garage. Finally, in February of 2002, after Mendez provided the City with another doctor's note stating that he could no longer work in the garage, the City claims that it told Mendez that he was no longer responsible for touring the garage premises and only had to patrol the land behind the garage. Mendez does not expressly deny that the City told him this, but claims that the signs posted at the garage still required him to tour the entire garage premises. Thus, Mendez claims that he made his "assigned tours" of the garage throughout his time there, though he conducted these tours in his car, exiting periodically to check areas that he could not adequately inspect from within his car. He also claims that he had to enter the garage to obtain running water for cleaning his tracheotomy tube because there was no running water in the trailer behind the garage.

These gradual changes in Mendez's work environment took place in response to his medical needs. According to Mendez the sanitary conditions within the garage were bad and Mendez claims that he was exposed to bird and rodent excrement, diesel exhaust, mold, overflowing toilets, standing water, and overall poor ventilation. According to Mendez's doctors, an individual with a tracheotomy tube is more susceptible to harm from these kinds of environmental contaminants. Cold air also has a more stressful effect upon individuals with a tracheotomy tube.

Mendez acknowledges that the City made changes in his job to accommodate his health such as his move to the day shift, under the assumption that the air would be warmer during that shift. However, Mendez claims that the changes came about slowly only as a result of his repeated complaints to the City and other agencies. In December of 2000, Mendez filed his first charge with the Equal Employment Opportunity Commission ("EEOC"), claiming that the City had discriminated against him by refusing his initial request for transfer to the day shift. The next day, the City moved him to the day shift. In the following months and years, Mendez also filed several complaints about the conditions in the garage with the Illinois Department of Labor ("IDL"). During the same period, the City received four citations from the IDL between May 2001 and December 2001 for conditions in the garage. After the second citation on July 25, 2001, the City told Mendez that he could work from the trailer behind the garage, as long as he conducted his required tours. Mendez complained to the IDL again after the fourth citation, and the IDL

3

returned for a follow-up inspection of the garage on March 25, 2002.

On March 27, 2002, the Director of Security, Chuck Hollinger ("Hollinger") came to conduct a tour of the garage with two of his superiors, Managing Deputy Commissioner James Chronis ("Chronis"), and Ray Gamboa. During their tour they noticed Mendez patrolling in his car. Hollinger approached Mendez and instructed him to conduct his patrols on foot. Hollinger claims that he was unaware that Mendez had been patrolling by car until this incident. Mendez claims that his superiors were aware that the watchmen at the garage often patrolled by car rather than on foot although Mendez offers no evidence to support such an assertion.

Hollinger scheduled a pre-disciplinary hearing for Mendez two days later. At the hearing in April of 2002, Mendez informed the City that he could not perform his duties on foot or drive long distances to work. Afterwards, the City's doctor conducted an examination of Mendez and determined that he was unfit for duty. The parties dispute whether Mendez voluntarily agreed to this examination or whether the City ordered him to attend. As a result of the doctor's findings, Mendez went on medical leave and has not returned to work at the garage.

On January 10, 2003, Mendez filed another charge of disability discrimination against the City with the EEOC. Mendez received notice of his right to sue from the EEOC on August 19, 2003 and filed suit in this court on November 14, 2003. Mendez filed the amended complaint alleging that the City violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, 42 U.S.C.

12112(b)(5)(A), by failing to make a reasonable accommodation for his disabilities, (Count I), and that the City discriminated against him in general because of his disability. (Count II).

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case."*Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*, 475 U.S. 574, 586 (1986).

Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

The City argues that most of Mendez's claims are time-barred and that Mendez's accommodation claims exceed the scope of his EEOC charge. In addition, the City contends that Mendez is not a "qualified individual" who may sue under the ADA, and that the City did not otherwise discriminate against Mendez.

1. Time-barred Claims

The City argues that the majority of Mendez's claims are time-barred. In Illinois, before an employee can sue his or her employer under the ADA, the employee must first file a charge of discrimination with the EEOC within three hundred days of the contested employment action. *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004); 42 U.S.C. § 2000e-5(e)(1). Failure to file a charge within the allotted time renders the charge untimely and precludes

the claimant from raising the same claim in a employment discrimination lawsuit. *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 574 (7th Cir. 1998).

In Count I of his Complaint, Mendez claims that the City violated the ADA by failing to provide him with reasonable accommodations for his disabilities. Initially, we need not determine whether the City actually met its obligation to provide reasonable accommodations under the ADA. We need only determine when the allegedly unlawful employment action occurred and whether Mendez filed his EEOC charge within 300 days of that employment action. Mendez filed his most recent EEOC charge on January 10, 2003. Thus, the three-hundred day period during which a claim would be timely extends back to March 5, 2002. Mendez asserts that some unlawful employment practices took place after this date, but further asserts that unlawful employment actions preceding this date are still timely under the theory of continuing violations.

The Seventh Circuit defines a continuing violation as a violation "that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Dasgupta v. Univ. of Wis. Bd. of Regents*, 121 F.3d 1138, 1139 (7th Cir. 1997). The theory of continuing violations allows a plaintiff to seek relief for acts which occurred outside of the limitations period by linking them to timely claims as part of a continuing wrong. *Place v. Abbott Labs.*, 215 F.3d 803, 807 (7th Cir. 2000). There are three recognized types of continuing

violations claims: (1) "where the exact day of the violation is difficult to pinpoint because the employer's decisionmaking process takes place over a period of time;" (2) "where the employer has a systematic, openly espoused policy alleged to be discriminatory;" and (3) "where the employer's discriminatory conduct is so covert that its discriminatory character is not immediately apparent." *Id.* at 808. However, the plaintiff cannot circumvent the limitations period by manufacturing an incident within the limitations period and then attempting to link it back to an untimely incident. *See Kennedy v. Chem. Waste Mgmt., Inc.*, 79 F.3d 49, 50-51 (7th Cir. 1996) (holding that employee could not revive his untimely claim regarding loss of seniority by filing a timely claim regarding his termination two years later); *Schroeder v. Univ. of Ill. at Chicago*, 1997 WL 43205, at *2 (N.D. Ill. 1997) (holding that employee could not revive his untimely claim of failure to accommodate by making subsequent requests for accommodation and then attempting to link them together as a continuing violation).

Mendez bases his accommodation claim upon the City's decision to assign him to the garage and its failure to transfer him to a cleaner working environment upon request. The City assigned Mendez to the garage in early 1997. Mendez claims that he made a verbal request for transfer to another job site prior to November 9, 2000, but his request was denied because he lacked sufficient seniority. (Compl. Par. 24-25). In July of 2001, the City began allowing Mendez to work in a trailer behind the garage while he was not making his rounds. Then, in December of

2001, the City offered Mendez a choice of assignments at other job sites, but he chose to remain at the garage, claiming that he lacked sufficient seniority to receive a day shift at the alternate sites. Finally, the City claims that in February of 2002, it told Mendez that he no longer had to patrol the interior of the garage, though he claims that he still had to do so.

Thus, the issue is whether Mendez should have recognized the City's failure to accommodate him prior to March 5, 2002. If he should have, then the continuing violation doctrine is inapplicable to his claims. *Dasgupta*, 121 F.3d at 1139. To make this determination, we must decide if the City's intervening accommodations render the alleged discrimination so "covert" that Mendez could not recognize it as actionable until some point during the limitations period. *Place*, 215 F.3d at 808. It is clear that Mendez should have recognized the City's alleged failure to accommodate him well before March of 2002. His repeated requests for transfer and additional accommodations during the preceding months and years make it clear that he did not find any of the City's intervening attempts at accommodation to be sufficient for his needs. More than a year passed between the City's initial refusal to transfer Mendez and its offer of alternate positions, and when the City finally did offer the alternate positions, Mendez did not find any of them satisfactory. The City allowed Mendez to work in the trailer beginning in July of 2001, but judging by his doctor's note of February 2002, this was not a sufficient accommodation, either. It was in response to this doctor's note that the City claims it told Mendez on February

9

11, 2002, that he was no longer responsible for patrolling inside the garage. Mendez did not understand the City's statements in this way and claims that he still had to patrol within the garage.

If we accept Mendez's version of events, then his doctor's note from February of 2002 resulted in no further accommodations. Even if we assume that Mendez was not aware of the City's alleged failure to accommodate him until this date, his claims would still be untimely. Three hundred and fifteen days elapsed between February 11, 2002 and the EEOC charge. Though Mendez submitted another doctor's note requesting accommodation in March of 2002, this does not save his claim, as denial of a repeat request for previously denied accommodations does not constitute a new discriminatory act or make the previous denial part of a continuing violation. *Schroeder v. Univ. of Ill. at Chicago*, 1997 WL 43205, at *2. While the process of finding suitable accommodations may take some time, Mendez did not act reasonably by waiting to involve the EEOC until January of 2003 when he should have known that his employer's attempts at accommodation were insufficient well before that time. Therefore, we grant the City's motion for summary judgment on the reasonable accommodation claim (Count I).

Even if the reasonable accommodation claim was timely the City would be entitled to summary judgment on the claim because the allegations were not within the scope of the EEOC charge. A plaintiff can bring an ADA "claim not explicitly included in an EEOC complaint only if [his] allegations fall within the scope of the

10

charges contained in the EEOC complaint" *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001). The scope of the EEOC charge encompasses allegations that are "like or reasonably related to those contained in the charge." *Id.* The plaintiff's "[c]laims are reasonably related if there is a factual relationship between them. . . [and thus] "the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals."*Id.* In Mendez's January 10, 2003, EEOC charge, Mendez did not allege that his work locations or his shift were not changed to accommodate him or that there were harmful conditions at work. Neither can we find that such allegations are reasonably related to the filed charge.

## II. Qualified Individual

The City argues that Mendez is not a qualified individual under the ADA. The ADA provides that "[n]o covered entity shall discriminate against a *qualified individual* with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112 (emphasis added). The ADA defines a qualified individual with a disability as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. . . ." 42 U.S.C. § 12111(8).

11

The essential functions for the watchman position included patrolling the designated areas and checking gates and another entry areas. Mendez was discovered attempting to patrol his assigned areas from his car. However, we agree with the City that a watchman could not properly patrol his area from a vehicle because he would not be able to hear all noises from inside the vehicle and his inspections would only be limited to areas wide enough to allow for vehicle access. When patrolling from his vehicle, Mendez was unable to perform essential tasks such as checking doors, abandoned vehicles, and broken windows. Mendez's ability to detect sounds and other irregularities that might alert a watchman would be severely limited by the fact that he was enclosed within the vehicle. Also, Mendez would necessarily need to devote attention to his driving which would detract from his ability to properly patrol.

Another essential function of the watchman position is to cover shifts for other watchmen. Mendez indicated that, due to his physical problems, he was unable to travel to certain other locations to cover the shifts of other watchmen. Therefore, the City is also entitled to summary judgment on all ADA claims because Mendez is not a qualified individual with a disability.

## III. Disparate Treatment Claim Discrimination

Though timely, the City still claims that Mendez cannot prevail on Count II of his Complaint. Mendez has not presented direct evidence of discrimination, and

must therefore proceed under the burden shifting approach. *DeLuca v. Winer Indus, Inc.*, 53 F.3d 793, 797 (7th Cir. 1995) (applying Title VII burden shifting approach to ADA cases). Under this indirect method, the plaintiff must show that: "(1) he belongs to the protected group; (2) he performed his job satisfactorily; (3) he was subjected to an adverse employment action; and (4) similarly situated employees received more favorable treatment." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 924 (7th Cir. 2001). If the plaintiff succeeds in establishing a prima facie case of discrimination, the burden then shifts to the defendant to state a nondiscriminatory reason for the adverse employment action. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). If the defendant does so, then the burden shifts back to the plaintiff to demonstrate that the reason articulated was merely a pretext for discrimination. *Id.*

The City argues, in part, that Mendez has failed to demonstrate that similarly situated employees without disabilities were treated differently than him for conducting tours by car rather than on foot. Mendez responded by producing the statements of two former watchmen at the same garage, Gamberale and Gibson, who claimed that they and others had conducted their required tours by car "from time to time." He argues that the fact that these other non-disabled employees were not reprimanded for using their personal vehicles while patrolling the garage supports his claim of discrimination.

Where a plaintiff claims that he has been treated more harshly than his co-

workers for comparable conduct, the plaintiff must show that the co-workers were similarly situated to him on all relevant factors. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). In a disciplinary case, the plaintiff can satisfy this burden by showing that he had the same supervisor, was subject to the same standards, and engaged in similar conduct as that of the co-worker at issue without any differentiating or mitigating factors that could explain the distinction between them. *Id.* at 617-18.

The other watchmen's statements do not satisfy Mendez's burden with regard to similarly situated co-workers. First, neither Gamberale nor Gibson states that Hollinger was aware that they sometimes drove their personal vehicles while conducting tours of the garage. Since it was Hollinger who approached Mendez regarding his behavior and scheduled Mendez's pre-disciplinary hearing, Mendez must show that Hollinger treated Gamberale and Gibson more leniently. *Buie*, 366 F.3d at 508 (holding that the plaintiff failed to show that co-workers were similarly situated where the plaintiff did not show that the co-workers were disciplined by the same individuals who had disciplined him);*Snipes v. Illinois Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002). Mendez has not shown that Hollinger treated these individuals more leniently than him, or that he was even aware of their behavior.

In addition, Mendez has not established that Gamberale and Gibson engaged in conduct substantially similar to his own. *See Radue*, 219 F.3d at 618 (stating that employee must show "substantial similarity" on the relevant factors to establish that

14

another employee was similarly situated to him). While all of these watchmen may have conducted some driving tours of the garage, we only know that Gamberale and Gibson did this "from time to time." In contrast, Mendez tells us that he conducted all of his tours by car throughout his five years at the garage. The greater frequency with which Mendez conducted tours by car might explain why his treatment was ultimately different than that of Gamberale and Gibson. Thus, Mendez has not shown that similarly situated employees without disabilities were treated more favorably than him with regard to conducting their tours by car. Therefore, Mendez has not established a prima facie case of disparate treatment in Count II of his Complaint. Neither has Mendez pointed to sufficient evidence to show that the given reason was a pretext.

## IV. Reasonable Accommodation

The City argues that Mendez cannot show that the City failed to provide reasonable accommodation and that Mendez did not make a request for a reasonable accommodation. To establish a *prima facie* case for a failure to accommodate claim a plaintiff must show that: 1) he suffered an adverse employment action, 2) he "was or is disabled," 3) "the defendant was aware of h[is] disability," 4) he "was otherwise qualified for h[is] job," and 5) the disability caused the adverse employment action. *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1032-33 (7$^h$ Cir. 1999). For the reasons stated above Mendez has failed to show that he was

otherwise qualified for his job. Neither has Mendez pointed to sufficient evidence that the given reasons by the City were a pretext.

In addition, the fact that Mendez was asked to undergo a medical examination is not an adverse employment action or a violation of the ADA. The ADA prohibits medical examinations by employers of their employees unless the examinations are either voluntary or "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4). The Seventh Circuit has noted that "an employer may inquire into the ability of an employee to perform functions related to his job" under the ADA. *Miranda v. Wisconsin Power & Light Co*, 91 F.3d 1011, 1017 (7th Cir. 1996). In addition, the City's judgment as to which job functions are essential is entitled to deference in the absence of contrary evidence. *Basith v. Cook County*, 241 F.3d 919, 928 (7th Cir. 2001). In light of the insufficiency of the statements by Gamberale and Gibson, Mendez has not produced sufficient evidence to overcome the deference given to the City's position on the essential functions of Mendez's job. *Id.* Therefore, the City did not violate the ADA by requesting that Mendez undergo a medical examination to determine if Mendez could perform those essential functions. 42 U.S.C. § 12112(d)(4). Also, in regards to the fourth factor of the *prima facie* case, Mendez has not pointed to sufficient evidence for a reasonable trier of fact to find that a disability caused any adverse employment action against him. Finally, we note that Mendez did not make a proper request for a reasonable accommodation other than in October of 2000.

## V. Visit to Kedzie Garage and Retaliation Claim

Mendez contends in his answer that the visit to the Kedzie garage was either discriminatory or retaliatory. However, Mendez did not bring a retaliation claim in his complaint either specifically or by alleging allegations that would indicate that he is bringing a retaliation claim. The dispositive motion stage is not the proper juncture to introduce new claims. *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 202 (7th Cir. 1996). Also, regardless, Mendez has not pointed to sufficient evidence to support a retaliation claim. He is unable to establish a *prima facie* case and unable to point to sufficient evidence to show a pretext. In regards to the inspection of the Kedzie garage, Mendez has failed to offer any evidence that would show that Hollinger acted improperly or that his actions were either retaliation or unlawful discrimination. Therefore, Mendez is not entitled to summary judgment to the extent that his claims are based upon the visit to the Kedzie garage.

## CONCLUSION

Based on the foregoing analysis, we grant the City's motion for summary judgment in its entirety.

Samuel Der-Yeghiayan
United States District Court Judge

Dated: December 20, 2004